**No. 22-15142**

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**
_____

ANYKA HARRIS, et al.,
*Plaintiffs-Appellees,*

*vs.*

CITY OF TULARE, et al.,
*Defendants-Appellants.*
_____

Appeal from the United States District Court
For the Eastern District of California
Case No. 1:18-cv-01135 JLT SKO
The Honorable Dale A. Drozd, United States District Judge
_____

**PLAINTIFFS-APPELLEES' JOINT ANSWERING BRIEF**
_____

LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo (Bar No. 144074) (dalekgalipo@yahoo.com)
Hang D. Le (Bar No. 293450) (hlee@galipolaw.com)
21800 Burbank Blvd., Suite 310
Woodland Hills, California 91367
Telephone: (818) 347-3333

Attorneys for Plaintiff-Appellee Anyka Harris

THE COCHRAN FIRM CALIFORNIA
Brian T. Dunn (Bar No. 176502) (bdunn@cochranfirm.com)
4929 Wilshire Boulevard, Suite 1010
Los Angeles, California 90010
Telephone: (323) 435-8205

Attorneys for Plaintiff-Appellee Bobby Reedom

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................... 1

STATEMENT OF JURISDICTION............................................. 2

ISSUES PRESENTED................................................................. 3

STATEMENT OF THE CASE...................................................... 4

    I.    Pertinent Procedural History ...................................... 4

    II.    Statement of Facts ..................................................... 5

        A.    The Tulare Officers Had Prior Contacts with Mentally-Ill Jontell ................................................................ 5

        B.    Officer Clinton Responds to a Call Involving Mentally-Ill Jontell and Tases Him ...................................... 5

        C.    Officer Valencia Arrives on Scene and Deploys his Taser Three Times at Jontell ...................................... 7

        D.    The Tulare Officers Struck Jontell Multiple Times with a Baton and Deployed Pepper Spray ................................. 8

        E.    The Tulare Officers Shoot and Kill Jontell...................... 9

        F.    The Tulare Officers' Conduct and Use of Deadly Force Violated Standard Police Officer Practices and Training ...................................................................... 10

SUMMARY OF THE ARGUMENT ......................................... 13

ARGUMENT ............................................................................ 14

    I.    The Court Lacks Jurisdiction to Review the Sufficiency of the Evidence that Formed the Basis for the District Court's Finding of Genuine Issues of Material Fact ......................................... 14

    II.    The Tulare Officers are Not Entitled to Qualified Immunity .. 17

        A.    The Tulare Officers are Not Entitled to Qualified Immunity Because Their Version of Events is Materially Inconsistent with Evidence in the Record...................... 18

        B.    The District Court Correctly Held that Clearly Established Law Placed the Tulare Officers on Notice that Their Shooting of Jontell Violated the Constitution20

            i.    Lam v. City of Los Banos Provided the Tulare Officers with Sufficient Notice that Their Use of

Deadly Force Against Jontell Violated the Constitution................................................ 20

ii.   Newmaker v. City of Fortuna Provided Clear Notice that the Tulare Officers Are Not Entitled to Qualified Immunity ............................................. 27

C.   Additional Case Law Placed on the Tulare Officers on Notice that Their Use of Deadly Force Against Jontell Violated the Fourth Amendment ................................... 30

D.   The Tulare Officers' Use of Deadly Force Against Jontell is an "Obvious Case" of Excessive Force.................... 33

E.   The Tulare Officers' Reliance on *Billington v. Smith* is Misplaced ....................................................................... 35

CONCLUSION ............................................................................. 38

# TABLE OF AUTHORITIES

## Cases

*Badgley v. United States*,
957 F.3d 969 (9th Cir. 2020) .......................................................27

*Billington v. Smith*,
292 F.3d 1117 (9th Cir. 2002) ......................................... 35, 36, 37

*Boyd v. Benton Cnty.*,
374 F.3d 773 (9th Cir. 2004) .......................................................32

*Branscum v. San Ramon Police Dep't.*,
606 F. App'x 860 (9th Cir. 2015) ................................................15

*Brosseau v. Haugen*,
543 U.S. 194 (2004) .....................................................................33

*Chien Van Bui v. City & Cty. of San Francisco*,
699 Fed. App'x 614 (9th Cir. 2017) ....................................... 30, 31

*City & Cnty. of San Francisco, Calif. v. Sheehan*,
575 U.S. 600 (2015) .....................................................................12

*Curnow v. Ridgecrest Police*,
952 F.2d 321 (9th Cir. 1991) .......................................................26

*Eng v. Cooley*,
552 F.3d 1062 (9th Cir. 2009) .......................................................2

*Est. of Aguirre v. Cnty. of Riverside*,
29 F.4th 624 (9th Cir. 2022) ........................................................34

*Est. of Anderson v. Marsh*,
985 F.3d 726 (9th Cir. 2021) ............................................. 2, 3, 34

*Est. of Lopez v. Gelhaus*,
871 F.3d 998 (9th Cir. 2017) ........................................... 14, 16, 18

*Foster v. City of Indio*,
908 F.3d 1204 (9th Cir. 2018) ........................................................2

*George v. Morris*,
736 F.3d 829 (9th Cir. 2013) .........................................................2

*Glenn v. Washington Cnty.*,
673 F.3d 864 (9th Cir. 2011) .......................................................14

*Gonzalez v. City of Anaheim*,
747 F.3d 798 (9th Cir. 2014) .......................................................18

iv

*Harris v. Roderick*,
　126 F.3d 1189 (9th Cir. 1997) ........................................................31

*Horton v. City of Santa Maria*,
　915 F.3d 592 (9th Cir. 2019) .........................................................32

*Johnson v. Jones*,
　515 U.S. 304 (1995).........................................................................2

*Karl v. City of Mountlake Terrace*,
　678 F.3d 1062 (9th Cir. 2012) ....................................................3, 14

*Khai v. Cnty. of Los Angeles*,
　823 F. App'x 534 (9th Cir. 2020) ..................................................28

*Kisela v. Hughes*,
　138 S. Ct. 1148 (2018).....................................................................3

*Lal v. California*,
　746 F.3d 1112 (9th Cir. 2014) ......................................................17

*Lam v. City of Los Banos*,
　976 F.3d 986 (9th Cir. 2020) ............................ 20, 21, 22, 23, 24, 25, 26

*Nehad v. Browder*,
　929 F.3d 1132-39 (9th Cir. 2019) ............................................ 14, 18

*Nelson v. Thurston Cnty.*,
　799 F. App'x 555 (9th Cir. 2020) ............................................ 18, 20

*Newmaker v. City of Fortuna*,
　842 F.3d 1108 (9th Cir. 2016) ........................... 18, 19, 22, 28, 29, 30

*Pearson v. Callahan*,
　555 U.S. 223 (2009).......................................................................17

*Prison Legal News v. Lehman*,
　397 F.3d 692 (9th Cir. 2005) .........................................................18

*Salvato v. Miley*,
　790 F.3d 1286 (11th Cir. 2015) ............................................... 32, 33

*Scott v. Henrich*,
　39 F.3d 912 (9th Cir. 1994) ...........................................................18

*Tabares v. City of Huntington Beach*,
　988 F.3d 1119 (9th Cir. 2021) ................................................ 23, 36, 37

*Taylor v. Riojas*,
　141 S. Ct. 52 (2020).......................................................................33

*Tekle v. United States*,
　511 F.3d 839 (9th Cir. 2007) .........................................................32

*Torres v. City of Madera*,
    648 F.3d 1119 (9th Cir. 2011) ................................................................ 14, 17

*United States v. Graf*,
    610 F.3d 1148 (9th Cir. 2010) ....................................................................27

*Vaughan v. Ricketts*,
    859 F.2d 736 (9th Cir. 1988) .......................................................................32

*Watkins v. City of Oakland*,
    145 F.3d 1087 (9th Cir. 1998) ....................................................................17

*White v. Pauly*,
    137 S. Ct. 548 (2017).......................................................................... 28, 33

*Wilkins v. City of Oakland*,
    350 F.3d 949 (9th Cir. 2003) ......................................................................18

*Zion v. County of Orange*,
    874 F.3d 1072 (9th Cir. 2017) ....................................................................26

## Other Authorities

Ninth Cir. Model Civ. Jury Instruction 9.25 ...........................................17

## Rules

Fed. R. App. P. 28(a)(8)(A) .......................................................................27

## **INTRODUCTION**

This 42 U.S.C. § 1983 civil rights case arises out of the officer-involved shooting death of Jontell Reedom ("Jontell") on March 12, 2018, by City of Tulare police officers Clemente Clinton ("Clinton") and Jose Valencia ("Valencia") (collectively "Tulare Officers"). Anyka Harris, Jontell's mother, and Bobby Reedom, Jontell's father, (collectively, "Jontell's Parents") are the Plaintiffs-Appellees in this case. Jontell's Parents contend that Clinton and Valencia used excessive force when they fired upon Jontell, who they knew or should have known was mentally ill, was moving away from the officers, was not threatening the officers with a baton, and therefore was not an immediate threat of death or serious bodily injury when he was shot multiple times without warning. On January 24, 2022, the district court issued an order granting in part and denying in part a motion for summary judgment filed by Defendants-Appellees City of Tulare, Clemente Clinton, and Jose Valencia. Specifically, the district court found that there were genuine disputes of material fact that precluded the granting of qualified immunity to Clinton and Valencia on their use of force against Jontell. Defendants-Appellees filed an interlocutory appeal from the district court's order denying qualified immunity.

This Court lacks jurisdiction the Tulare Officers' arguments regarding the sufficiency of the evidence that led the district court to find that a reasonable jury

could conclude Jontell did not pose an immediate threat of death or serious bodily injury at the time of the shooting. It is clear that the district court correctly found disputed issues of fact that preclude summary judgment and qualified immunity for the Tulare Officers' use of deadly force against Jontell. The district court also correctly determined that the law was clearly established at the time of the incident to put the Tulare Officers on notice that their use of deadly force under the circumstances, taking all facts and reasonable inferences in favor of Jontell's Parents, violated Jontell's Fourth Amendment rights.

## STATEMENT OF JURISDICTION

Appellate Jurisdiction. The scope of the Court's review on interlocutory appeal is "circumscribed." *Est. of Anderson v. Marsh*, 985 F.3d 726, 730 (9th Cir. 2021) (citing *Foster v. City of Indio*, 908 F.3d 1204, 1210 (9th Cir. 2018)). Only "portion[s] of the summary judgment order that turns on the 'application of clearly established law' to a given (for appellate purposes undisputed) set of facts" is immediately appealable." *Id.* at 731 (citing *Johnson v. Jones*, 515 U.S. 304, 313 (1995)). By contrast, "[a]ny decision by the district court 'that the parties' evidence presents genuine issues of material fact is categorically unreviewable on interlocutory appeal.'" *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013) (quoting *Eng v. Cooley*, 552 F.3d 1062, 1067 (9th Cir. 2009)).

2

"Where there are disputed issues of material fact, [this Court's] review is limited to whether the defendant would be entitled to qualified immunity as a matter of law, assuming all factual disputes are resolved, and all reasonable inferences are drawn, in plaintiff's favor." *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1068 (9th Cir. 2012); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1150-51 (2018) (per curiam). On appeal, the Tulare Officers take issue with the district court's determination of certain facts in the nonmovant's favor and rely on a version of the story that takes some critical facts and inferences in their favor to argue that the district court erred in denying qualified immunity. This Court lacks jurisdiction to review the Tulare Officers' "factual disputes about the record." *Anderson*, 985 F.3d at 732.

## ISSUES PRESENTED

1.     Whether the Tulare Officers are entitled to qualified immunity when there are genuine disputed issues of material fact because evidence in the record is inconsistent with the material evidence proffered by the Tulare Officers.

2.     Whether the Tulare Officers are entitled to qualified immunity for their use of deadly force against Jontell, who the officers knew or should have known was mentally ill, had taken away an officer's baton in self-defense, but was backing away from the officers, was not brandishing the baton or threatening the

officers with the baton, and was not an immediate threat of death or serious bodily injury to anyone at the time Tulare Officers shot him to death.

## STATEMENT OF THE CASE

### I.  Pertinent Procedural History

Plaintiffs Anyka Harris and Bobby Reedom are the mother and father of Jontell Reedom. Each plaintiff brought a civil-rights action in the United States District Court for the Eastern District of California against the City of Tulare, Clemente Clinton, and Jose Valencia, which were consolidated and merged into this action. Defendants City, Clinton, and Valencia filed their motion for summary judgment on June 10, 2020. On January 24, 2022, the district court entered an order (1-ER-2–36) that denied Defendants' Motion for Summary Judgment in part, specifically denying the Tulare Officers' request for qualified immunity based on their use of deadly force against Jontell. The district court found that viewing the facts in the light most favorable to the nonmovants, "Jontell was mentally ill, had recently been fighting with the police officers, had disarmed one of them of his baton, was moving away from the officers, and was not threatening them" when "[h]e was shot without warning, resulting in his death." (1-ER-26–27). Under those facts, the district court held that Jontell's right against excessive deadly force under was clearly established at the time of the incident and the defendants are not

4

entitled to summary judgment in their favor on qualified immunity grounds. (*See* 1-ER-26–31). Defendants-Appellants filed their Notice of Appeal on January 28, 2022. (3-ER-478–480).

## II.    Statement of Facts

### A.    The Tulare Officers Had Prior Contacts with Mentally-Ill Jontell

Prior to this incident, Officer Clinton and Officer Valencia had prior contacts with Jontell. When Clinton contacted Jontell for causing a disturbance that, Jontell was aggressive and confrontational, told Clinton he wanted to be left alone, and walked away. (2-ER-309–10). However, the contact ended without Clinton needing to use force. (2-ER-311). Valencia had seen or spoken to Jontell during two prior contacts involving Jontell. (2-ER-263, 264). Despite Jontell's behavior during both contacts, Officer Valencia never made the determination that Jontell was under the influence of drugs. (2-ER-265). During both prior contacts, although Jontell was initially uncooperative, Valencia was able to convince him to cooperate after speaking with him for a while. (*Id.*). At all relevant times, Jontell was suffering from schizophrenia. (1-ER-4; 2-ER-93, 109, 128, 133, 135, 163–64).

### B.    Officer Clinton Responds to a Call Involving Mentally-Ill Jontell and Tases Him

On March 12, 2018, Clinton and Valencia received a call regarding an individual who had assaulted a bus driver. (*See* 3-ER-355). The officers received information that the subject did not have any weapons and that there were no

injuries. (2-ER-266, 293–94; 3-ER-355, 356). The officers also received information that the subject was leaving the area of the alleged assault. (2-ER-266; 3-ER-356). Clinton was the first to respond and observed a subject matching the given description (later identified as Jontell) and did not observe any weapons in Jontell's hands or on his person and nor did he observe Jontell commit a crime. (2-ER-295). When Officer Clinton made contact with Jontell, Jontell was walking away from him. (2-ER-295–96). Jontell expressed doubt that Clinton was a real cop and accused Clinton of sleeping with his girlfriend, which made Clinton think that Jontell was being irrational and acting oddly. (2-ER-299–300; 3-ER-346). Clinton had received training that a person under the influence of drugs and a person experiencing a mental illness may exhibit similar behavior. (2-ER-202-203). Clinton also admitted that it was unclear whether Jontell even understood what Clinton was saying when he attempted to explain to Jontell that he was a real cop. (2-ER-246–47). Police practice expert, Roger Clark, opined that based on the officers' prior contacts with Jontell during which he exhibited bizarre behavior but did not appear to be under the influence of drugs and Clinton's initial encounter with Jontell during which Jontell made bizarre statements and did not appear to comprehend what Clinton was saying, a reasonable officer would have recognized that Jontell was mentally ill or experiencing a mental health crisis as officers are trained to recognize behavioral signs and general indicators of mental illness in

6

order to use proper communication and de-escalation techniques for persons with mental illnesses. (*Id.*).

Jontell told Clinton, "Don't touch me," and walked away. (2-ER-301). After Jontell walked away, Clinton ordered him to stop and to come back. (2-ER-302). Jontell complied by stopping and turning back towards Clinton. (2-ER-303–04). At this point, Clinton deployed his taser at Jontell (2-ER-304), which is contrary to standard police practices and officer training in which officers are trained to de-escalate the situation, to avoid threatening mentally ill subjects, and to avoid physical contact with mentally ill subjects. (2-ER-246–47). Clinton ended up on his buttocks and when Jontell approached Clinton, Clinton used his feet to push Jontell back, at which point Jontell walked away. (3-ER-378, 379–80). Clinton then got onto his feet, alerted dispatch that he had been in a fight, requested expedited backup, and followed Jontell as he walked away. (2-ER-304).

C. Officer Valencia Arrives on Scene and Deploys his Taser Three Times at Jontell

Valencia first observed Jontell when he was walking westbound on Cross towards Cherry Street with Clinton following Jontell. (2-ER-267). Valencia did not see any weapons in Jontell's hands or on his person. (*Id.*). As Jontell allegedly walked in Valencia's direction, Valencia allegedly said to Jontell, "Jontell, stop." (2-ER-267–68). At this point, both officers had the opportunity to de-escalate the situation by waiting for backup that Clinton had already requested to be expedited.

7

(2-ER-247). Instead, Valencia further escalated the encounter by discharging his taser at Jontell's upper torso without warning. (2-ER-247, 268, 269). After Valencia's initial taser deployment, Jontell ran away from Valencia and Valencia chased after. (2-ER-259 at 00:00-00:07, 2-ER-305). As he was chasing Jontell, Valencia discharged his taser at Jontell again. (2-ER-259 at 00:07-00:09, 2-ER-271). Jontell then slowed down, which allowed Valencia to catch up to him. (2-ER-259 at 00:08-00:17). As Jontell walked past Valencia, Valencia initiated physical contact by using his taser to drive-stun Jontell in his upper back, (2-ER-194, 2-ER-259 at 00:08-00:17, 2-ER-270), after which the two engaged in a physical altercation. Prior to the drive-stun, Jontell had not verbally threatened Valencia, punched or kicked Valencia, or tackled Valencia. (*Id.*). The subsequent autopsy report of Jontell noted four distinctly colored dots to his right upper chest and three linear dots to the lower right abdomen that could be consistent with taser marks (2-ER-255), confirming that the officers' taser deployments, at a minimum, connected with Jontell.

### D. The Tulare Officers Struck Jontell Multiple Times with a Baton and Deployed Pepper Spray

After Valencia and Jontell exchanged punches, Jontell moved away from Valencia and Valencia retrieved his baton while requesting for backup to assist him in detaining Jontell. (2-ER-259 at 00:21-00:23, 2-ER-272, 284–85). Despite retrieving his baton, Valencia did not have a plan as to how he would detain Jontell

8

with the assistance of his baton. (2-ER-196). Instead, in an apparent attempt of retaliation, Valencia struck Jontell with his baton in the torso area. (2-ER-259 at 00:23-00:25, 2-ER-255, 2-ER-273). Approximately seven seconds after the first baton strike and as Jontell was attempting to move away from the officers, Clinton ran up and deployed pepper spray in Jontell's face, which according to officer training could interfere with a person's ability to see. (2-ER-248–49, 2-ER-259 at 00:25-00:33, 2-ER-306–07). Approximately three seconds after, Valencia struck Jontell in the legs with his baton again. (2-ER-255, 2-ER-259 at 00:33-00:36, 2-ER-273). Jontell's subsequent autopsy report noted that Jontell sustained an elongate 2 1/8 inch abrasion to his mid abdomen consistent with a baton strike mark and two distinct abrasions clustered about the right knee, evidencing that Jontell was struck and injured by the baton strikes. (2-ER-255).

    E. <u>The Tulare Officers Shoot and Kill Jontell</u>

    Officers are trained that citizens have the right to defend themselves against excessive force used by law enforcement. (2-ER-249). Officers are also trained that expected responses to baton strikes include blocking the strikes and grabbing the baton. (2-ER-249, 275). Immediately after Jontell grabbed the baton to protect himself from additional strikes, Jontell was approximately ten feet away from Valencia. (2-ER-278). After Jontell grabbed the baton, he moved back and away from Valencia. (2-ER-259 at 00:35-00:39). Valencia also took about two steps

9

back and away from Jontell. (2-ER-277). Then surprisingly and without warning, Clinton fired seven consecutive shots at Jontell and Valencia fired two shots at Jontell. (2-ER-267; 3-ER-400–01).

In the cell phone video of the incident captured by a bystander, Jontell does not appear to raise the baton above his head or make any threatening motion with the baton prior to the shots. (2-ER-249, 2-ER-259 at 00:35-00:39, 2-ER-280). Both officers admit that Jontell never swung the baton at any of the officers at any time. (2-ER-276, 277, 279, 286–87, 288–89, 308). It does not appear on the video that Jontell moved forward towards any of the officers after the first gunshot was fired. (2-ER-259 at 00:38). The video does depict, however, that after Jontell fell to the ground, the officers continued to shoot at him. (2-ER-259 at 00:39-40). Jontell sustained nine gunshot wounds and died as a result of his wounds. (2-ER-252, 253). The cause of death was a single penetrating gunshot wound to the head, with a slight downward trajectory. (2-ER-252).

F.  The Tulare Officers' Conduct and Use of Deadly Force Violated Standard Police Officer Practices and Training

Plaintiff's police practices expert, Roger Clark, a 27-year-veteran of the Los Angeles County Sheriff's Department, opined that the Tulare Officers' use of escalating force and ultimately use of deadly force in this incident was contrary to standard police practices and officer training, especially in light of the fact that the officers knew or should have known that Jontell was mentally ill. (2-ER-244, 245–

10

46, 249–50). Mr. Clark further opined that the numerous applications of the taser without warning, baton strikes without a plan or warning, and deployment of pepper spray without a warning were contrary to standard police practices and officer training under the circumstances. (2-ER-247–48). A reasonable officer in Clinton and Valencia's positions would have waited for backup to arrive and assist in detaining Jontell, especially in light of both officers' request for backup. (2-ER-246–47, 248–49, 249–50). The Tulare Officers also violated standard police practices and training by continually escalating the encounter by uses of escalating force. (2-ER-246–49).

Based on the bystander video of the incident, in which Jontell does not appear to raise the baton over his head or make any swinging motion, appears to be backing up and away from Valencia after taking the baton, and based on the officers' statements that Jontell never swung the baton, Mr. Clark opined that Clinton and Valencia's use of deadly force against Jontell violated standard police practices, training, and POST standards on the use of deadly force because the officers were not being confronted with an immediate defense of life situation, there was no immediate or imminent threat of death or serious bodily injury at the time of the shooting, and the officers had less-than-lethal alternatives to subdue or

take Jontell into custody.[1] (2-ER-249–50). Officers are trained that they cannot shoot someone for merely having a wood or metal weapon, knife, or gun in their hand or for being involved in a physical altercation. (2-ER-250). Officers are further trained that subjective fear is insufficient to justify the use of deadly force and that an overreaction in using force is excessive force. (*Id.*). The number of shots fired at Jontell violated standard police practices and training that the officers are responsible for every shot and must reassess the threat after every shot. (2-ER-250). In Mr. Clark's opinion, the Tulare Officers overreacted in using deadly force against Jontell under the facts and circumstances facing the officers at the time of the shooting. (*Id.*). Ultimately, the Tulare Officers should not have shot at all and the excessive number of shots was contrary to standard police officer practices and training. (2-ER-249–50).

---

[1] While the Tulare Officers argue that an expert's opinion cannot defeat qualified immunity on summary judgment, the district court correctly stated, in addressing defendants' same argument on summary judgment, that the Tulare Officers' reliance on *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600 (2015), to support their argument was misplaced. The Supreme Court's statement regarding expert opinion was made in connection with consideration of the second step of the qualified immunity analysis, and "[n]othing in that decision prohibits [the] court from considering Clark's expert opinion on summary judgment as to the issue of whether the deadly force used by the police in this case was excessive." (1-ER-21).

## SUMMARY OF THE ARGUMENT

This Court should affirm the district court's denial of qualified immunity to the Tulare Officers for their use of deadly force against Jontell. There are disputed issues of material fact that preclude the granting of summary judgment based on qualified immunity. Additionally, taking the facts as the district court has properly done, in the light most favorable to the Jontell's Parents, the Tulare Officers shot, without prior warning, a mentally-ill Jontell, who had disarmed one of the officers of his baton in an attempt to defend himself against additional strikes, and was moving away from the officers and was not threatening the officers, with the baton or otherwise. Under those facts, the case law was clearly established at the time of the incident to put the Tulare Officers on notice that their use of deadly force, against a suspect who posed no immediate threat of death or serious bodily injury, violates the Constitution.[2]

---

[2] Jontell's Parents also contend that the Tulare Officers' other uses of force, including multiple applications of the taser, punches, and strikes with the baton, were excessive and unreasonable under the circumstances. The district court acknowledged Jontell's Parents arguments but confined its analysis to only the issues raised by the moving party, which was the Tulare Officers' use of force with respect to deadly force only. (*See* 1-ER-13).

13

## ARGUMENT

I.  **The Court Lacks Jurisdiction to Review the Sufficiency of the Evidence that Formed the Basis for the District Court's Finding of Genuine Issues of Material Fact**

 "On an interlocutory appeal of a denial of qualified immunity, [the Court's] review is limited to purely legal issues." *Est. of Lopez v. Gelhaus*, 871 F.3d 998, 1007 (9th Cir. 2017) (internal quotation marks and citation omitted). "Where the objective reasonableness of an officer's conduct turns on disputed issues of material fact, it is a question of fact best resolved by a jury, ... , only in the absence of material disputes is it a pure question of law." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) (internal quotation marks and citations omitted). "Where there are disputed issues of material fact, [this Court's] review is limited to whether the defendant would be entitled to qualified immunity as a matter of law, **assuming all factual disputes are resolved, and all reasonable inferences are drawn, in plaintiff's favor**." *Karl*, 678 F.3d at 1068 (emphasis added); *see also Kisela*, 138 S. Ct. at 1150-51 .

While noting that while there is some video evidence of the incident, the district court implicitly, and correctly, found that "reasonable factfinders might be able to draw divergent conclusions from what the video evidence shows." (1-ER-12) (citing *Nehad v. Browder*, 929 F.3d 1125 (9th Cir. 2019); *Glenn v. Washington Cnty.*, 673 F.3d 864, 878 (9th Cir. 2011); *Branscum v. San Ramon Police Dep't.*,

14

606 F. App'x 860, 862 (9th Cir. 2015)). Thus, viewing the facts and evidence in the light most favorable to the nonmovants, the district court specifically found a reasonable jury could conclude that: (1) Jontell was not holding the baton above his head when the Tulare Officers shot him and was not brandishing the baton at all (1-ER-19–20); (2) Jontell did not move forward after the first shot was fired by the Tulare Officers and instead dropped directly to the ground (1-ER-20); (3) it is undisputed that Valencia stepped back after Jontell took his baton (1-ER-8); (4) Jontell grabbed the baton to defend himself and thereafter moved away from the Tulare Officers, thus posing even less of a threat to them (1-ER-20); (5) Jontell did not pose an immediate threat of death or serious bodily injury to the Tulare Officers or others at the time of the shots (1-ER-23); (6) it is undisputed that the Tulare officers failed to warn Jontell before using various types of force, including before shooting him (1-ER-24); and (7) the Tulare Officers knew or should have known that Jontell was mentally ill (1-ER-25).

In addition, the district court noted that there were disputed issues of fact regarding the events leading up to the shooting, including the video showing that Valencia drive-stunned Jontell before the two began punching each other and whether Jontell was struck by the taser and struck by the baton strikes. (1-ER-7). The district court also noted that there was evidence to support the contention that Jontell was approximately 10 feet away from the officers at the time of the shots

15

(1-ER-8), that he dropped to the ground after the first shot (1-ER-9), and that the officers continued to shoot Jontell after he fell to the ground (*id*.). Accordingly, the district court concluded that viewing the evidence in the light most favorable to the nonmovants, a reasonable jury could determine that the Tulare Officers used excessive force and violated Jontell's constitutional rights. (1-ER-25).

On appeal, the Tulare Officers reject this understanding of the record, arguing that neither officer ever subjectively perceived Jontell as mentally ill (AOB 10), Jontell initiated physical contact with Valencia by punching him (AOB 12-13), the baton strikes missed Jontell (AOB 13), prior to the shots Valencia advanced on Jontell to retrieve his baton (*id*.), Jontell raised the baton in striking position towards Valencia prior to the shots (AOB 6, 14), and thus, "the circumstances underlying an analysis of 'clearly established' law are not in dispute" (AOB 14). Additionally, on appeal the Tulare Officers ignore the district court's finding that a reasonable jury could conclude Jontell was moving away from the officers at the time of the shots. (*See* 1-ER-20).

On interlocutory appeal of a denial of qualified immunity, the Court "must take, as given, the facts that the district court assumed when it denied summary judgment for a (purely legal) reason." *Lopez*, 871 F.3d at 1007. Because the district court found genuine issues of fact concerning the reasonableness of the Tulare Officers' actions, this Court's review is limited to determining whether clearly

established law existed at the time of the incident that the officers' conduct could have violated, after viewing the facts in the light most favorable to the nonmovants and as construed by the district court. *Watkins v. City of Oakland*, 145 F.3d 1087, 1091 (9th Cir. 1998).

## II.     The Tulare Officers are Not Entitled to Qualified Immunity

"In determining whether an officer is entitled to qualified immunity, [the court] consider[s] (1) whether there has been a violation of a constitutional right ; and (2) whether that right was clearly established at the time of the officers' alleged misconduct." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

As discussed above, on an interlocutory appeal of the denial of qualified immunity, all factual disputes must be resolved and all reasonable inferences must be drawn in the non-movants' favor, which the Tulare Officers have failed to do here. *See supra* Argument, Section I. Moreover, while the Tulare Officers contend that they should be entitled to qualified immunity even if their use of deadly force was a result of a mistake of fact, law or a mix of both, an officer's mistake of fact must be a reasonable one (which is a question for the trier of fact to resolve), *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011); *see* Ninth Cir. Model Civ. Jury Instruction 9.25, and the second prong of the qualified immunity analysis serves to determine whether an officer is entitled to qualified immunity

based on a mistake of law, *see Wilkins v. City of Oakland*, 350 F.3d 949, 954-55 (9th Cir. 2003); *Nehad*, 929 F.3d at 1140.

When all factual disputes are resolved and all reasonable inferences are drawn in Jontell's Parents' favor, the Tulare Officers' use of deadly force against Jontell was excessive and unreasonable. Based on the facts and reasonable inferences viewed in Jontell's Parents' favor, the law concerning Jontell's Fourth Amendment right against the Tulare Officers' use of excessive deadly force was clearly established at the time of the incident. In considering existing precedent, the Court "may look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent." *Prison Legal News v. Lehman*, 397 F.3d 692, 702 (9th Cir. 2005).

A. <u>The Tulare Officers are Not Entitled to Qualified Immunity Because Their Version of Events is Materially Inconsistent with Evidence in the Record</u>

"Qualified immunity should not be granted when other evidence in the record . . . is inconsistent with material evidence proffered by the defendant." *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016) (citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)); *see Nelson v. Thurston Cnty.*, 799 F. App'x 555, 556-57 (9th Cir. 2020); *Nehad*, 929 F.3d at 1140 ("there are numerous genuine disputes of material fact, which preclude a grant of summary judgment on qualified immunity"); *Gonzalez v. City of Anaheim*, 747 F.3d 798, 791 (9th Cir. 2014) (en banc); *Lopez*, 871 F.3d at 1008, 1012, 1013. Here, the district court

concluded that there was evidence in the record that was inconsistent with the material evidence proffered by the Tulare Officers. (*See* 1-ER-20). Specifically, the district court found that contrary to the officers' version of the facts, a reasonable jury could conclude, based on the evidence, that Jontell was not holding the baton above his head when the officers shot him, and therefore, was not brandishing the baton at all. (1-ER-19–20). Additionally,

> The court conclude[d] that from the evidence submitted, a reasonable jury could find that [Valencia's testimony that Jontell was still coming forward with the baton raised after the first shot] is inconsistent with the Handheld Video. A jury could conclude instead that the video evidence shows Jontell did not move forward after the first shot was fired by officers and instead dropped directly to the ground [Citation omitted]. If the jury were to so conclude, it could also find that Jontell grabbed officer Valencia's baton to defend himself and that he thereafter moved away from the officers, thus posing even less of a threat.

(1-ER-20). And, contrary to what the officers contend on appeal, Jontell was not directly in front of either officer at the time of the shots but approximately 10 feet away. (1-ER-7–8). Thus, the district court's denial of summary judgment based on qualified immunity was proper because the version of events proffered by the Tulare Officers is materially contradicted by evidence in the record. *See Newmaker*, 842 F.3d at 1116-17 (reversing the district court's granting of qualified immunity to the shooting officer because evidence in the record materially contradicted the officer's version of the events and the case required a jury to sift through disputed facts, "including whether the officers were telling the truth about

19

when, why, and how Soeth shot Newmaker"); *Nelson*, 799 Fed. App'x at 556-57 (affirming the district court's denial of summary judgment based on qualified immunity because "[w]eighing inconsistent testimony about the shooting, as well was reports that cast doubt in [the officer's] version of events").

B. The District Court Correctly Held that Clearly Established Law Placed the Tulare Officers on Notice that Their Shooting of Jontell Violated the Constitution

    i.   *Lam v. City of Los Banos Provided the Tulare Officers with Sufficient Notice that Their Use of Deadly Force Against Jontell Violated the Constitution*

The district court correctly found that under the facts of this case, in which a mentally-ill Jontell, who had recently been fighting with police officers, had disarmed one of them of his baton, but was moving away from the officers and not threatening them with the baton or otherwise, case law was clearly established at the time of the incident to give the Tulare Officer fair warning that shooting Jontell was unconstitutional under the circumstances, and therefore, the officers are not entitled to qualified immunity. (*See* 1-ER-26–31). In doing so, the district court found that two Ninth Circuit cases with analogous facts were instructive in making this determination. (*Id.*).

The district court first identified *Lam v. City of Los Banos*, 976 F.3d 986 (9th Cir. 2020) as an analogous case in in which "the facts...are quite similar to those presented by the evidence before the court in this case." (1-ER-27, 28). In

*Lam*, the suspect, who was mentally ill, had just engaged the officer in a physical altercation in which he stabbed the officer with a pair of scissors. *Lam*, 976 F.3d at 991-92. The officer then shot the suspect and retreated down the hall. *Id.* at 992. The suspect then, unarmed, approached the officer, at which point the officer shot again, killing the suspect. *Id.* at 991, 995. At trial, a jury found that the officer's second shot constituted excessive force. *Id.* at 994. On appeal, the Ninth Circuit determined that the officer was not entitled to qualified immunity for his fatal second shot because the law was clearly established, at the time of the 2013 incident, "that an officer violates the Fourth Amendment by shooting a person who had previously injured someone but no longer posed an immediate threat." *Id.* at 999-1001.

Similarly in this case, Jontell was a mentally-ill suspect who had just engaged in a physical altercation with the Tulare Officers. However, at the time of the shooting, under the facts construed by the district court in the light most favorable to Jontell's Parents, Jontell was not brandishing the baton or threatening the officers, was moving away from the officers, and therefore no longer posed an immediate threat. Accordingly, the district court found that "even though the facts in *Lam* were not identical to those before the court in this case, they are sufficiently analogous to be instructive." (1-ER-28). And while it is true that in certain circumstances, an officer may reasonably use deadly force against a subject

21

brandishing a dangerous weapon (the district court found that Jontell was not brandishing the baton) because the Fourth Amendment does not require omniscience or absolute certainty of harm (*see* AOB 26, 27)[3], nor does the Fourth Amendment provide an officer with carte blanche to use deadly force simply due to a suspect's possession of a weapon at some point or because the suspect had previously injured someone if the suspect no longer posed an immediate threat at the time of the use of deadly force, *see Lam*, 976 F.3d at 1001.

The Tulare Officers take issue with the some of the factual differences of the case in arguing that *Lam* cannot be relied on as clearly established law. However, the factual distinctions identified by the Tulare Officers are immaterial to the use of deadly force analysis, or in some case, used facts that are improperly resolved in the Tulare Officers' favor.

For example, the Tulare Officers contend that the officer in *Lam* had been informed about the suspect's mental illness while the Tulare Officers had no knowledge that Jontell suffered from any mental issues. However, the only

---

[3] The Tulare Officers contend that due to "tense, rapidly evolving and uncertain circumstances" the officers should not be expected to consider what Jontell's intentions were in taking Valencia's baton and that Jontell's possession of the baton was enough to justify their use of deadly force. The Ninth Circuit in *Newmaker* implicitly rejected a similar contention in reversing the district court's grant of summary judgment based on qualified immunity due to the district court's conclusion that "it was reasonable for Officer Soeth to conclude that Newsmaker might use the baton in a dangerous way against Ellebrecht, merely be virtue of having it in his possession." *Newmaker*, 842 F.3d at 1110, 1116-17.

information the officer in *Lam* had regarding the suspect's possible mental illness was the plaintiff telling the officer that his son had "lost his mind." *Lam*, 976 F.3d 986, 992. The officer was never directly informed of any mental illness. Likewise here, the Tulare Officers had objective evidence, including Jontell's bizarre statements not believing Clinton was a real cop and accusing Clinton of sleeping with his girlfriend, that, based on standard police officer training, should have informed them that Jontell was suffering from a mental illness. *See Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1127-28 (9th Cir. 2021) (finding that a reasonable jury could conclude that the shooting officer should have suspected that the suspect had mental health issues based on the objective evidence of the suspect's unusual behavior, hand gestures, a witness's observation of the suspect looking "out of it" and "crazed," and the standard officer training regarding recognizing indicators of mental illness).

Next, the Tulare Officers contend that the suspect in *Lam* was confined to a bedroom whereas Jontell had just assaulted a bus driver and was confronted on public streets, in an attempt to show that *Lam* did not pose a threat to anyone besides the officers while alleging that Jontell was still a threat to others. The Tulare Officers once again misapprehend the facts in *Lam*. The officer in *Lam* was responding to a call of a possible assault, as the suspect had previously attempted to hit his father, who was inside the home and nearby when the suspect was in the

23

hallway approaching the officer before being shot. *Lam*, 976 F.3d at 991-92. However, the Ninth Circuit did not identify this as a material fact in its qualified immunity analysis. Similarly here, while the Tulare Officers did have information that Jontell had assaulted a bus driver and was still out in public, this is not an material fact to the officers' ultimate use of excessive deadly force.

The Tulare Officers also contend that the officer in *Lam* did not make any less-lethal attempts to control the suspect before firing the second fatal shot, whereas the Tulare Officers did. However, the officer in *Lam* did attempt alternatives prior to his use of deadly force, including trying to speak and reason with the suspect, giving the suspect warnings to drop the scissors, and retreating away from the suspect. *Lam*, 976 F.3d at 992. Additionally, the officer in *Lam* only armed himself with his firearm after the suspect had grabbed a potentially serious weapon and initially shot because the suspect had *stabbed* the officer with the weapon. *Id.* Here, prior to grabbing Valencia's baton, Jontell was unarmed. When Jontell did grab the baton, Jontell did not attempt to use the baton against the officers, let alone actually strike the officers with the baton. Moreover, neither officer ever gave Jontell commands to drop the baton or a warning prior to their use of deadly force, despite Jontell being approximately 10 feet away and not brandishing the baton in a threatening manner at the time of the shooting.

The Tulare Officers further contend that the officer in *Lam* had retreated from the suspect before the second shot whereas Jontell was directly in front of Valencia at the time of the shots. The Tulare Officers misrepresent the facts as found by the district court. The district court found that there was evidence that after Jontell disarmed Valencia of his baton, he was up to ten feet away from Valencia. (1-ER-7–8). Moreover, the district court found that it was *undisputed* that Valencia stepped back after Jontell took his baton. (1-ER-8). Thus, Jontell was not "directly in front of Officer Valencia" at the time of the shots; Jontell was not in striking distance, was moving away, and Valencia had also created additional distance from Jontell.

The Tulare Officers' last two "factual distinctions" are immaterial to the Tulare Officers' use of deadly force analysis. The pause between the first and second shots by the officer in *Lam* only serves to show that an officer may not continue to use deadly force if the threat of death or serious bodily injury has ended, even if the officer had just been in a fight with the suspect and had been injured by the suspect. *See Lam*, 976 F.3d at 1001. In this case, when the Tulare Officers shot at Jontell there was no immediate threat of death or serious bodily injury because Jontell was not brandishing or threatening the officers with the baton and was moving away from the officers. Thus, the last factual distinction of officer pre-existing mental issues also does not factor in because it does not make

25

it more or less likely that Jontell did not pose an immediate threat of serious bodily injury at the time of the fatal shooting.

Additionally, recognizing that the decision in *Lam* was issued after the incident at issue here, the district court performed a thorough analysis of the rule this Court applied in finding that *Zion v. County of Orange*, 874 F.3d 1072 (9th Cir. 2017) provided persuasive authority for a finding of clearly established law in *Lam*, despite *Zion* being decided after the incidents in *Lam*.[4]  Specifically, the Ninth Circuit stated:

> When a case involves analogous conduct that occurred around the same time as the underlying incident in the matter before [the Court], and the case holds that the conduct at issue there violated clearly established law, then that case may indicate that the claim for qualified immunity presently before [the Court] should likewise be rejected.

*Lam*, 976 F.3d at 1001-02 (citing *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 & n.*** (9th Cir. 1991)). Accordingly, this Court found the reasoning from *Zion* to be persuasive as clearly established law even though the shooting in *Zion* occurred 22 days after the shooting in *Lam* and *Zion* was decided after the shooting at issue

---

[4] The Tulare Officers misapprehend the district court's order in arguing that the district court identified *Zion* as a case with sufficiently analogous facts to the facts of this case. The district court's analysis of *Zion* was in relation to the rule that allowed the district court to use *Lam* as an instructive case under the "clearly established" prong of the qualified immunity analysis. (*See* 1-ER-28–29). Appellee notes, however, similar to the officer in *Zion* who shot a previously combative suspect who was in possession of a weapon after he had gone to the ground, the Tulare Officers continued to shoot at Jontell after he had dropped to the ground.

in Lam. *Id.* Likewise, the district court found *Lam* to be instructive of clearly established law despite *Lam* having been decided after the 2018 incident at the center of this case because the Ninth Circuit had found that at the time of the 2013 incident in *Lam*, the law was already clearly established to put the officer on notice that his conduct (which is materially similar to the conduct of the Tulare Officers) violates the Constitution. (1-ER-29).

ii.   *Newmaker v. City of Fortuna Provided Clear Notice that the Tulare Officers Are Not Entitled to Qualified Immunity*

The district court also identified *Newmaker v. City of Fortuna*, a 2016 Ninth Circuit decision, as a case with sufficiently analogous facts that "parallels the present case in many respects." (1-ER-30). First, Jontell's Parents note that the Tulare Officers do not offer any developed arguments regarding whether the facts in *Newmaker* are materially different than the facts of this present case. Instead, the Tulare Officers argue that *Newmaker* cannot be relied upon because the Ninth Circuit did not perform an analysis of the "clearly established" prong of qualified immunity in that case. Accordingly, Jontell's Parents contend that the Tulare Officers have waived any argument that *Newmaker* does not provide precedential authority to support the denial of summary judgment based on qualified immunity. *See* Fed. R. App. P. 28(a)(8)(A); *see also Badgley v. United States*, 957 F.3d 969, 978-79 (9th Cir. 2020); *United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) (holding that "[a]rguments made in passing and not supported by citations to the

record or to case authority are generally deemed waived."); *Khai v. Cnty. of Los Angeles*, 823 F. App'x 534, 535 n.1 (9th Cir. 2020) ("arguments presented in such a cursory manner are waived.").

Moreover, the Tulare Officers fail to cite to any authority to support their argument that a case that does not engage in analysis of the "clearly established" prong cannot provide clear notice that similar conduct is unconstitutional. This argument also misapprehends the standard on qualified immunity. Under the "clearly established analysis," identified case(s) must only find that the officer's use of force under similar circumstances was unreasonable. *See White v. Pauly*, 137 S. Ct. 548, 552 (2017).

In *Newmaker*, officer Soeth encountered Newmaker, whose strange behavior led him to believe Newmaker was either mentally ill or on drugs. 842 F.3d at 1111. Soeth physically engaged Newmaker in an altercation that brough Newmaker down to the ground, and attempted to use his taser against Newmaker multiple times to little to no effect. *Id.* at 1111-12. Sergeant Ellebrecht arrived to help subdue Newmaker as Soeth took his baton out to use it against Newmaker. *Id.* at 1112. The officers claimed that Newmaker took possession of Soeth's baton and swung it violently and aggressively at Ellebrecht's head. *Id.* Soeth ordered Newmaker to drop the baton before shooting Newmaker. Soeth further claimed

that he shot Newmaker a second time as Newmaker was getting up and starting to swing the baton again. *Id.*

On appeal, the Ninth Circuit reversed grant of summary judgment based on qualified immunity, noting that there were numerous disputed issues of material fact based on the inconsistencies in the officers' statements and depositions, a grainy video that called into doubt the officers' version of the shooting, and physical forensic evidence that precluded the grant of qualified immunity. *See id.* at 1110, 1113-15. Specifically, conflicting versions of the events were given by the officer. *Id.* at 1113-14. Additionally, the grainy video reflected "nothing clearly visible" in Newmaker's hand before the shooting and appeared to show Soeth shoot Newmaker after Newmaker fell to the street. *Id.* at 1115. Also, Newmaker's bullet wound trajectories supported the contention that he was not standing when he was shot. *Id.* Thus, among other reasons that summary judgment on qualified immunity was inappropriate, this Court found that,

> A reasonable jury could conclude that Soeth and Ellebrecht were wrong when they claimed that Newmaker grabbed the baton. In the alternative, a reasonable jury could conclude, given the trajectory of the bullets through Newmaker's body, that even if Newmaker had grabbed the baton Officer Soeth could not have fired his first shot while Newmaker was standing up and swinging the baton.

*Id*. at 1116.

Here, Jontell was also exhibiting strange behavior that would lead a reasonably trained officer to believe Jontell be mentally ill. Jontell also engaged

physically with the officers prior to their use of deadly force, and was tased repeatedly. And, just as the video evidence was found to be potentially inconsistent with the *Newmaker* officers' claim that the suspect had taken the baton from the officer and was standing up, swinging the baton at the time of the first shot, a jury could find that the video evidence here is inconsistent with the Tulare Officers' claims that Jontell held the baton over his head in a striking position and was moving towards the officers prior to and during the shots. In reviewing the grainy video in *Newmaker*, this Court found that Soeth appeared to shoot Newmaker after Newmaker fell to the street. Similarly, the video in this present case can also be found to show that the officers continued to shoot at Jontell after he had dropped to the ground. Thus, the decision in *Newmaker*—in which this Court implicitly found that a jury could conclude Soeth's use of deadly force against Newmaker was not reasonable under the facts viewed in the light most favorable to the plaintiffs—provided the Tulare Officers with clear notice that their use of deadly force against Jontell under significantly similar circumstances violated Jontell's Fourth Amendment rights. *See Newmaker*, 842 F.3d 1110, 1116-17.

C. Additional Case Law Placed on the Tulare Officers on Notice that Their Use of Deadly Force Against Jontell Violated the Fourth Amendment

Additional case law within the Ninth Circuit supports the denial of qualified immunity to the Tulare Officers. In *Chien Van Bui v. City & Cnty. of San Francisco*, 699 Fed. App'x 614 (9th Cir. 2017), this Court held that it was clearly

established at the time of the 2010 incident at issue that the officers' use of deadly force, without warning, against a mentally-ill suspect, who had previously cut a teenager with an X-Acto knife and was holding the knife in his hand while slowly shuffling towards the officers but did not raise his arm or make any threatening gestures with the knife and was turning away at the time of the shots, violated the Constitution because officers "'may not kill suspects who do not pose an immediate threat to their safety or to the safety or others simply because they are armed,' including in some circumstances in which the suspect has 'committed a violent crime in the immediate past.'" 699 Fed. App'x at 615, 616 (quoting *Harris v. Roderick*, 126 F.3d 1189, 1203-04 (9th Cir. 1997)). In *Harris v. Roderick*, this Court held that an officers' use of deadly force, without warning, against a suspect armed with a gun and who had shot at officers in the immediate past was not reasonable because the suspect had made no aggressive move of any kind. 126 F.3d at 1203. Thus, it was clearly established at the time of incident here that the Tulare Officers' use of deadly force, without warning, against a mentally ill, non-threatening and retreating Jontell, who was in possession of the officer's baton but never brandished the baton or threatened the officers with the baton prior to the shooting, violated the Constitution.

Moreover, the Ninth Circuit may "look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity

31

purposes, including decisions of state courts, other circuits, and district courts."
*Horton v. City of Santa Maria*, 915 F.3d 592, 601 n.9 (9th Cir. 2019) (quoting
*Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004)). This is particularly true
where similar facts concerning unreasonable force has been addressed in a sister
circuit. *See Vaughan v. Ricketts*, 859 F.2d 736, 740-41 (9th Cir. 1988) (adopting
sister circuit's ruling as clearly established law where facts were "similar to those
presented here"); *Tekle v. United States*, 511 F.3d 839, 847-48 (9th Cir. 2007)
(relying on factually similar cases in other circuits for proposition that
unreasonable force claim was clearly established).

The Eleventh Circuit denied qualified immunity in a case with significantly
similar facts. In *Salvato v. Miley*, 790 F.3d 1286 (11th Cir. 2015), Deputy Miley
responded to a disturbance call alongside a road and encountered Salvato, who was
acting irrationally and had tried to walk away from the deputy. 790 F.3d at 1290. A
backup deputy arrived, drew his gun, and ordered Salvato to the ground. *Id.* When
the deputies attempted to place Salvato in handcuffs, a struggle ensued and Salvato
and the backup deputy exchanged blows. *Id.* Salvato then backed up and rushed at
the backup deputy, hitting him again before hitting Miley in the head, knocking her
down to the ground. *Id.* Salvato then retreated to approximately 10 to 15 feet away
from Miley, at which point Miley drew her handgun and shot Salvato without
warning. *Id.* The Tenth Circuit held that Miley was not entitled to qualified

immunity for her use of deadly force because it was clearly established that using deadly force, without warning, against a retreating suspect is excessive. *Id.* at 1293-94. Similarly in this present case, while Jontell had previously exchanged punches with the Tulare Officers, Jontell was retreating and was approximately 10 feet away when the Tulare Officers shot him without warning.

Jontell's Parents submit that the cases discussed above, where "[the] officer act[ed] under similar circumstances as [the Tulare Officers and were] held to have violated the Fourth Amendment," *White*, 137 S. Ct. at 552, are sufficient to put the deputies on notice that Sergeant Tusant's use of deadly force violated King's Fourth Amendment to be free from unreasonable and excessive force.

D. The Tulare Officers' Use of Deadly Force Against Jontell is an "Obvious Case" of Excessive Force

While Jontell's Parents contend that there are sufficient analogous cases with particularized facts similar to this present case to place the officer on notice that Jontell's right against excessive deadly force was "clearly established" under the circumstances, Appellees also contend that the facts of this case present an "obvious case" of using excessive force in shooting and killing a nonthreatening suspect. *See Taylor v. Riojas*, 141 S. Ct. 52, 53-54 (2020) (reaffirming *Hope*'s holding that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question") (per curiam); *see also Brosseau v. Haugen*, 543 U.S. 194,199 (2004) ("[I]n an obvious case,

[highly generalized standards] can clearly establish [a constitutional violation], even without a body of relevant case law." (citations and internal quotation marks omitted)).

Recently, in *Estate of Aguirre v. County of Riverside*, 29 F.4th 624 (9th Cir. 2022), a case with similar facts to this present case, this Court held that the "general constitutional rule" elucidated in *Graham* and *Garner* against deadly force where the suspect does not pose an immediate threat to the officer or others applied to the facts in *Aguirre* "with obvious clarity" and rendered the officer's decision to shoot the suspect objectively unreasonable. *See* 29 F.4th at 629. There, the officer shot at the suspect, who was in possession of a bat/stick, while he was holding the bat/stick in a nonthreatening manner and was not moving or charging towards the officer. *Id.* at 628. Prior to the shooting, the officer had received information that the suspect was using a large stick to damage property, had previously threatened a bystander, and had gone onto private property to interact with a family while armed with the large stick. *Id.* at 626. Additionally, the suspect had repeatedly failed to comply with the officer's command to drop the bat/stick. *Id.* The Ninth Circuit found that on the nonmovant's facts, the suspect "presented no threat at all to the officer—or anyone else—in that moment" he was shot.

Like the officer in *Aguirre*, the Tulare Officers also had information that Jontell may have posed a danger to others when they responded to the call.

Additionally, Jontell also failed to comply with some of the Tulare Officers' commands and was in possession with a possible blunt weapon at the time of the shooting. However, like the suspect in *Aguirre*, Jontell was not holding the baton in a threatening manner and was not charging or advancing towards the Tulare Officers at the time of the shooting. Accordingly, under the facts as presented by Jontell's Parents, the Tulare Officers' use of deadly force against Jontell may also be viewed as an "obvious case" of excessive deadly force against a nonthreatening suspect.

### E. The Tulare Officers' Reliance on *Billington v. Smith* is Misplaced

The Tulare Officers' reliance on *Billington v. Smith*, 292 F.3d 1117 (9th Cir. 2002) to support their argument that the officers are entitled to qualified immunity is misplaced, as the facts in *Billington* are significantly different from the facts in this present case. The Tulare Officers once again, misrepresent the facts of the case, in arguing that *Billington* is analogous to this case. Contrary to the Tulare Officers' position, *Bilington* does not stand for the proposition that an officer need not hope for the suspect to disarm himself before using deadly force against the "substantial possibility" that the suspect will seriously injure the officer simply because the suspect had previously fought with the officer and had tried to grab an officer's weapon. (*See* AOB 31-32).

Indeed, this Court rejected such an overbroad reading of *Billington* in *Tabares v. City of Huntington Beach*. In *Tabares*, when the officer attempted to stop a mentally-ill suspect from his aggressive approach with his taser to no visible effect, the suspect approached the officer and punched him in the face. 988 F.3d at 1123. The two then began to fight and after several seconds, ended up on the ground. *Id*. at 1123-24. While the officer was on top of the suspect on the ground, the suspect grabbed at the office's belt and the officer repeatedly commanded him to "let go of the gun." *Id.* at 1124. Thereafter, the officer felt the suspect take an item from his belt, stood up, drew his gun, retreated approximately 15 feet away from the suspect and started shooting. *Id*. This Court reversed the district court's grant of summary judgment and rejected the district court's finding that *Billington* was instructive in finding that an immediate significant threat existed. *Id.* at 1129.

In *Billington*, the police officer was "locked in hand-to-hand combat and losing" while grappling over the control of his gun. 292 F.3d at 1185. Moreover, it was undisputed that the suspect was the aggressor and that he kept beating the officer even when the officer tried to retreat. *Id.* The suspect "actively, violently, and successfully resisted arrest and physically attacked [the officer] and tried to turn [the officer's] gun against him. *Id.* Thus, the Ninth Circuit held that the officer reasonably shot the suspect even if he had just *pushed* the suspect back a few feet because at the time of the shooting, the suspect was *charging* at the officer and had

36

raised his right hand to hit the officer again. 292 F.3d at 1182, 1185. Accordingly, this Court found that *Billlington* did not apply to the facts in *Tabares* because the officer and suspect were not locked in hand-to-hand combat and the evidence showed that the suspect was not charging or attempting to hit the officer at the time of the shots. *Tabares*, 988 F.3d at 1129-30. "[A]s a matter of federal law…*Billington* does not mean that after multiple ignored warnings and nearly a minute of sustained combat, [the officer] was objectively entitled to infer that no amount of warnings or non-lethal means will succeed in safely subduing the [the suspect]" who was 15 feet away. *Id.* at 1130 (cleaned up).

Here, unlike in *Billington* where the suspect was the aggressor and continually attempted to fight the officer even after the officer attempted to retreat, Jontell was a mentally-ill individual who had expressed multiple times that he did not want to engage with the officers. While Jontell did fight with the officers, it was only after the officers continually tried to engage Jontell while Jontell attempted create distance from the officers. Jontell only took the baton after he had tried repeatedly to distance himself from the officers but instead was multiple times with the baton. Additionally, unlike in *Billington* in which the suspect had tried to turn the officer's gun against him, was winning the hand-to-hand combat, and was charging at the officer and about to hit the officer again at the time of the shooting, Jontell was not brandishing the baton or threatening the officers with the

37

baton at the time of the shooting and was not moving towards the officers during the shots. Evidence in the record supports a finding that a reasonable jury could conclude that "Jontell grabbed officer Valencia's baton to defend himself and that he thereafter moved away from the officers" (1-ER-20) and that he was approximately 10 feet away from the officers at the time of the shooting (1-ER-7-8). Thus, the Tulare Officers were not objectively entitled to infer that Jontell posed a serious risk of bodily injury simply because he was in possession of Valencia's baton, especially when Jontell was moving away from the officers and approximately 10 feet away at the time of the shooting.

## **CONCLUSION**

For the foregoing reasons, the Court should affirm the district court's denial of qualified immunity in all respects.

Respectfully submitted,

DATED: June 3, 2022        LAW OFFICES OF DALE K. GALIPO


By  */s/ Hang D. Le*
    Dale K. Galipo
    Hang D. Le
    Attorneys for Plaintiff-Appellee Anyka
    Harris


DATED: June 3, 2022        THE COCHRAN FIRM CALIFORNIA


By  */s/ Brian T. Dunn*
    Brian T. Dunn
    Attorneys for Plaintiff-Appellee Bobby
    Reedom

39

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)**  | 22-15142

The undersigned attorney or self-represented party states the following:

◉  I am unaware of any related cases currently pending in this court.

○  I am unaware of any related cases currently pending in this court other than the
case(s) identified in the initial brief(s) filed by the other party or parties.

○  I am aware of one or more related cases currently pending in this court. The
case number and name of each related case and its relationship to this case are:

**Signature** | /s/ Hang D. Le          **Date** | Jun 3, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 17**                                                        *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-15142

I am the attorney or self-represented party.

**This brief contains** | 9,437 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

　○ it is a joint brief submitted by separately represented parties;

　○ a party or parties are filing a single brief in response to multiple briefs; or

　○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [＿＿＿＿＿].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Hang D. Le | **Date** | Jun 3, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**      *Rev. 12/01/2018*